# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYREE JACKSON, | : | |
|     *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| CORIZON HEALTH, INC. *et al.*, | : | No. 17-2838 |
|     *Defendants*. | : | |

## **M E M O R A N D U M**

PRATTER, J.                                                                                                                                       JULY 17, 2018

### INTRODUCTION

Tyree Jackson is a prisoner with chronic intestinal illnesses. For five months in 2015, he was temporarily transferred from federal prison to city custody in Philadelphia. He alleges that the city prison doctors failed to address his dire medical problems because of two customs or policies: (1) requiring new inmates to discard their old medications and await new medications upon arrival at the prison, and (2) delaying treatment when an inmate is about to be transferred out of the prison. Mr. Jackson says that these practices caused him to suffer severe symptoms, lose 60 pounds, and undergo two invasive surgeries.

Mr. Jackson brought this civil rights claim against the prison medical provider and staff members, and the defendants have moved to dismiss the case. For the reasons that follow, the Court grants the motion as to the first alleged custom or policy but denies the motion as to the second custom or policy.

1

## BACKGROUND

### I. Alleged Facts

Mr. Jackson suffers from several chronic intestinal illnesses, including Crohn's disease. Compl. ¶ 8. To try to keep his conditions in check, he takes over ten medications per day. He also undergoes monthly chemotherapy because of his increased risk of colon cancer. *See id.* ¶¶ 9–12.

In June 2014, Mr. Jackson was arrested and detained in federal prison. *Id.* ¶ 10. For the next year, he was transferred between federal prison and Philadelphia city prison several times. During this period, he received all the medical care he needed. *See id.* ¶¶ 13–18.

His recent problems began in June 2015, when he was transferred from federal to city prison "as a detainment until the conclusion of an unrelated criminal trial." *Id.* ¶ 19. Medical care in the city prison was provided by Corizon Health Inc., one of the defendants in this case.[1] *See id.* ¶ 6. Corizon had a "policy of refusing to allow him to use his previously prescribed medications," instead insisting that he "order new medications." *Id.* ¶ 21. His new medications did not arrive for a week. This lapse in treatment caused Mr. Jackson to suffer incontinence, constipation, and stomach pain. *See id.* ¶¶ 22–24. Corizon's insistence that prisoners order new medications is the first of two policies or customs that Mr. Jackson alleges operated to deny him medical care in this case.

Even after Mr. Jackson received his new medication, his health continued to deteriorate. From June to August, he complained to Corizon staff of "rectal bleeding, nausea, vomiting and

---

[1] The complaint refers interchangeably to Corizon and to the medical staff at Curran-Fromhold Correctional Facility, the city prison where Mr. Jackson was housed. But Corizon, not CFCF, is a named defendant. Because Corizon was the exclusive medical provider at the prison, the Court interprets any mention of "CFCF medical staff" or "CFCF medical practices" to refer to the staff and practices of Corizon itself.

constipation." *Id.* ¶ 26. He was examined by several Corizon doctors, including defendants Vivian Gandy and Almeda Frias, the prison's medical director. *See id.*¶¶ 6–7, 29.[2]

Yet the Corizon staff failed to address Mr. Jackson's worsening condition. Instead, for nearly three months, Corizon doctors repeatedly asked Mr. Jackson "about his release date back to federal custody." *Id.* ¶ 30. They told him that "since he was going to return to federal custody shortly," he could wait to "get his care from the Federal government." *Id.* ¶ 29; *see also id.* ¶ 32 ("Despite presenting with clear evidence of medical attention, [staff] continued to ask about [Mr. Jackson's] return date to federal custody and mentioned him receiving his medical care when he went to the federal government."). From these statements, Mr. Jackson surmises a second unlawful policy or custom by Corizon: foregoing costly treatment for prisoners who Corizon expects to soon leave the prison.

Finally, Mr. Jackson's condition became so dire that he was hospitalized at Penn Presbyterian Medical Center for three days in late August 2015. *See id.* ¶¶ 34–38. He was discharged with instructions to undergo an MRI to assess his need for intestinal surgery. *Id.* ¶ 40.

Corizon never worked to obtain the MRI. Instead, prison doctors once again asked Mr. Jackson "when he was scheduled to return to federal custody so the federal government would pay for the additional medical services." *Id.* ¶ 41. As a result, throughout September, Mr. Jackson continued to suffer "abdominal pain, severe rectal bleeding, vomiting, [and] mucus in his stool." *Id.* ¶ 42. All told, he lost roughly 60 pounds during his ordeal from June to September. *See id.* ¶¶ 35, 42.

---

[2] The complaint alleges that Almeda Frias is a doctor. At oral argument, however, her counsel suggested that this allegation was incorrect. Until the Court receives a stipulation or other written indication to the contrary, the Court will take the allegations in the complaint as true. Therefore, the balance of this Memorandum will refer to her as Dr. Frias.

In October 2015, Mr. Jackson underwent two surgeries to remove parts of his large and small intestines and his appendix. *Id.* ¶¶ 43–44. Even after he returned to the prison, Corizon staff kept asking about "the timeline of [Mr. Jackson] returning to federal custody" and suggested that he wait "to seek additional medical care once under federal custody." *Id.* ¶ 47. In November, Mr. Jackson was transferred to federal custody.

## II. Procedural History

Mr. Jackson brought this case *pro se* against Corizon and several members of its staff. The case was placed on the Prisoner Civil Rights Panel and eventually taken on by an attorney. The latest iteration of the complaint — Mr. Jackson's first complaint with counsel — brings one Eighth Amendment claim under 42 U.S.C. § 1983 against Corizon, Dr. Gandy, and Dr. Frias. Corizon and Dr. Frias have moved to dismiss.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation marks omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994).

Also, the Court must accept as true all reasonable inferences emanating from the allegations, and view those facts and inferences in the light most favorable to the nonmoving party. *See Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or even discount reality. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

## DISCUSSION

Claims against private medical providers such as Corizon are analyzed under the standard for municipal liability set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003). Thus, Mr. Jackson must show that the defendants, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [his] constitutional harm." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989).

Under this rule, the defendants challenge Mr. Jackson's complaint in four ways. They argue that:

1) Mr. Jackson has not alleged deliberate indifference to a serious medical need.

2) He has not alleged a policy or custom approved by a final policymaker.

3) He has failed to allege that any policy or custom caused his constitutional injury.

4) He cannot sustain a claim against the individual doctor defendants.

5

The Court rejects all but the second argument. As to that argument, the Court grants the motion as to the first alleged custom or policy (that the prison required new inmates to discard their old medications and await new medications upon arrival at the prison) but denies the motion as to the second custom or policy (that the prison delayed treatment when an inmate is about to be transferred out of the prison).

## I. Deliberate Indifference to Serious Medical Needs

If a medical provider demonstrates "deliberate indifference" to an inmate's "serious medical needs," then the inmate may have a claim under the Eighth Amendment and § 1983. *See, e.g.*, *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995) (citing *Walmsley v. City of Philadelphia*, 872 F.2d 546, 551–52 (3d Cir. 1989); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Here, Mr. Jackson's complaint satisfies both requirements: (1) deliberate indifference and (2) serious medical needs.

First, Mr. Jackson has adequately alleged deliberate indifference by Corizon and its staff. A prison official exhibits deliberate indifference by ignoring "a substantial risk of serious harm" to an inmate. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (noting that deliberate indifference exists when an official "knows of a prisoner's need for medical treatment but intentionally refuses to provide it" or "delays necessary medical treatment based on a non-medical reason"). Here, Mr. Jackson alleges that, in the face of his repeated pleas for help and increasingly severe symptoms, the Corizon staff opted to simply wait until he was transferred to federal custody. *Cf. White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990) (concluding that a complaint sufficiently alleged deliberate medical indifference when it detailed not "a mere isolated episode of inadvertence, but persistent conduct

in the face of resultant pain and risk of permanent injury"). At the pleadings stage, these allegations are sufficient to state a claim for deliberate indifference.

Second, Mr. Jackson's medical needs were serious. "A medical need is 'serious' . . . if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (quoting *Pace v. Fauver*, 479 F. Supp. 456, 458 (D.N.J. 1979)); *see also Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003). Here, Mr. Jackson has alleged that over a period of five months, he suffered incontinence, constipation, stomach pain, rectal bleeding, vomiting, and mucus in his stool. *See* Compl. ¶¶ 22–24, 26, 42. He lost 60 pounds and had to have parts of both intestines surgically removed. *Id.* ¶¶ 35, 42–44. His medical needs, as alleged, were serious.

## II. Policy or Custom by a Final Policymaker

Liability under § 1983 attaches when a "policy or custom" by an actor "whose edicts or acts may fairly be said to represent official policy" causes a constitutional injury. *See Monell*, 436 U.S. at 694. Corizon argues that the complaint is insufficient on both scores: Mr. Jackson has failed (1) to allege a policy or custom and (2) to name a final policymaker with final responsibility. The Court concludes (1) that Mr. Jackson has adequately alleged a single policy or custom and (2) that the complaint's failure to name a final policymaker is not fatal at this stage.

### A. *Policy or Custom*

"A policy is made 'when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict.'" *Natale*, 318 F.3d at 584 (quoting *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996)). By contrast,

"[a] course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials are so permanent and well settled' as to virtually constitute law." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Monell*, 436 U.S. at 690).

Here, Mr. Jackson alleges two practices by Corizon that served to deny him medical care:

1) Corizon's insistence that Mr. Jackson order new medications, rather than continue to use the medications he brought to prison. *See* Compl. ¶¶ 21–23, 27. This practice caused Mr. Jackson to go a week without medication in June 2015.

2) Corizon's refusal to treat Mr. Jackson because of his imminent transfer to federal prison. *See id.* ¶ 50. This practice was apparent at three times:

   a. On "several occasions" between June and August 2015, Corizon staff told Mr. Jackson to wait to receive care until his transfer to federal custody. *See id.* ¶¶ 29–32.

   b. In September, Corizon did not comply with Penn Presbyterian's instructions that Mr. Jackson undergo an MRI, and prison doctors instead asked "when he was scheduled to return to federal custody so the federal government would pay for the additional medical services." *See id.* ¶ 41.

   c. After Mr. Jackson's surgeries in October, Corizon staff kept asking about "the timeline of [Mr. Jackson] returning to federal custody" and suggested that he wait "to seek additional medical care once under federal custody." *Id.* ¶ 47.

The complaint does not characterize either practice definitively as a "policy" or as a "custom."

Mr. Jackson's claim under the first practice must fail. He can identify only one instance of being denied medications under an alleged rule that new inmates must order their medications anew. "A single incident by a lower level employee acting under color of law . . . does not

suffice to establish either an official policy or a custom." *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989).

For the same reasons, however, the second practice survives the motion to dismiss. Mr. Jackson has alleged that, for roughly four months, Corizon staff repeatedly gave him little to no treatment because of his impending transfer to federal custody.

The lackluster care offered to Mr. Jackson is akin to the stalled treatment offered to the prisoner in *Ramos-Vazquez v. PrimeCare Medical*, No. 09-CV-364, 2010 WL 3855546 (E.D. Pa. Sept. 30, 2010). There, as here, a prisoner faced repeated delays in obtaining treatment from the prison medical provider. *See id.* at *9 (explaining that the prisoner's medications were "confiscated and not replaced," that the prisoner did not see a doctor "for at least the first ten days of his incarceration," and that he did not see a psychiatrist for 18 days). The medical provider knew of the prisoner's illness and should have known that its "failure to treat" the prisoner "could have serious negative consequences." *Id.* Although the medical provider argued that the prisoner could not "identify the policies, procedures or customs of which he complains," the Court held that such "failures are not fatal at the pleading stage." *Id.*

So too here. To borrow the reasoning of the court in *Ramos-Vazquez*, Mr. Jackson has reasonably concluded

> that the actions he complains of were undertaken pursuant to some policy, procedure or custom of at least one of the entities that controlled and implemented medical treatment at the prison. At this stage, [Mr. Jackson] cannot be expected to specify and articulate which policy, procedure or custom resulted in these actions.

*See id.*

### B. Final Policymaker

Corizon argues that Mr. Jackson's claim must fail for not specifying a final policymaker responsible for Corizon's allegedly unlawful policies and customs. A plaintiff in a § 1983 action must "show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews*, 895 F.2d at 1480.

In his briefing, Mr. Jackson concedes that his complaint "does not identify a specific policymaker by name." Resp. to Mot. Dismiss, Doc. No. 51, at 12. The question, therefore, is whether Mr. Jackson needs to name a final policymaker in his complaint in order to survive a motion to dismiss. The Court concludes that he does not.

To begin, the Third Circuit Court of Appeals has suggested that a complaint need only obliquely support an inference that a policymaker knew of an unlawful practice. *See McTernan v. City of York*, 564 F.3d 636, 659 (3d Cir. 2009) ("There is no allegation that either the Mayor or the Police Chief were aware of [the unlawful practice]. Nor do the allegations support, indirectly, such an inference."). A wooden requirement that Mr. Jackson name a final policymaker in his complaint is out of step with the notion that an indirect inference of policymaker awareness suffices at the pleadings stage.

The courts have even extended the indirect inference of policymaker knowledge to the summary judgment stage. In *Natale*, the court was faced not with the presence of a harmful policy, but with the absence of a beneficial policy: the prison medical provider had "no policy ensuring that an inmate having need of medication for a serious medical condition would be given that medication during the first 72 hours of his incarceration." 318 F.3d at 585. By failing to implement any such policy, the prison had "turned a blind eye to an obviously inadequate practice." *Id.* at 584. At the summary judgment stage, the court permitted a jury to infer that "a

system responsible for assessing the medical needs of all incoming prisoners would be the product of a decisionmaker's action or acquiescence." *Id.* at 585 (quotations omitted).

To this forgiving precedent, the Court adds a pragmatic consideration. Even if Mr. Jackson needed to name a final policymaker in his complaint, the Court would be inclined to grant him leave to amend his complaint to do so. "The Federal Rules of Civil Procedure allow for the liberal amendment of pleadings and the decision whether such leave should be granted is 'committed to the sound discretion of the district court.'" *Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 188 (3d Cir. 2016) (quoting *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 629 (3d Cir. 2013)). But the Court questions the efficiency of another round of pleadings on such a minor point, especially when Mr. Jackson could presumably discover the identity of Corizon's final policymaker with a simple, targeted interrogatory. In the "broad case management discretion" afforded to district courts, *see OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 493 n.9 (3d Cir. 2016), the Court declines to bother with the rigmarole of ordering another complaint.

Consistent with these considerations, the court in *Ramos-Vazquez* denied a motion to dismiss that made the same argument advanced by Corizon here. Faced with the contention that the complaint did not name a final policymaker, the court concluded that, "[a]t this stage," the prisoner-plaintiff "cannot be expected . . . to know which entity formulated each policy." *Ramos-Vazquez*, 2010 WL 3855546, at *9. The Court agrees: Mr. Jackson's failure to name the final Corizon policymaker in the complaint is not fatal.[3]

---

[3] The Court acknowledges that decisions in the Eastern District of Pennsylvania have been inconsistent on this point. *Compare Ramos-Vazquez*, 2010 WL 3855546, at *9, *with Hope v. Fair Acres Geriatric Ctr.*, 174 F. Supp. 3d 880, 888 (E.D. Pa. 2016) ("Plaintiff makes no attempt to identify an official with the requisite power who made or failed to make a policy that caused her injuries. . . . Therefore, Plaintiff fails to state a claim under § 1983 from the outset."), *and Brower v. Corizon Health Servs.*, No. 15-CV-5039, 2016 WL 2346754, at *3 (E.D. Pa. May 4,

11

**III.  Causation**

Mr. Jackson has adequately alleged that the defendants' policies or customs caused his Eighth Amendment rights to be violated.  To prevail on a claim under § 1983, the plaintiff must show "a direct causal link" between the "policy or custom and the alleged constitutional deprivation."  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (quoting *Bailey v. County of York*, 768 F.2d 503, 507 (3d Cir. 1985); and *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).  "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury."  *Id.* at 851 (citing *Black v. Stephens*, 662 F.2d 181, 190–91 (3d Cir. 1981)).

Here, Mr. Jackson has adequately pleaded a "causal link."  Corizon allegedly failed to treat him pending his imminent transfer to federal custody.  Mr. Jackson alleges that the delay caused him to lose significant weight "with constant bouts of inability to pass a bowel, abdominal pain and bleeding from his rectum."  Compl. ¶ 35.  Mr. Jackson's eventual surgeries were "due to" the prison's "failure to adequately care for his serious medical condition from June 2015 to October 2015."  *Id.* ¶ 49.  Mr. Jackson has alleged a plausible connection between Corizon's inaction and his medical misfortune.

---

2016) (noting that the plaintiff "fails to allege who the policymaker is" and concluding that the claim failed "[i]n the absence of allegations . . . identifying a policymaker").  For both precedential and pragmatic reasons, the Court sides with *Ramos-Vazquez*.

## IV. Personal Liability of Dr. Frias

Dr. Frias challenges her personal liability under § 1983. An individual defendant in a civil rights action "must have personal involvement in the alleged wrongdoing." *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.* (quoting *Rode*, 845 F.2d at 1207).

Here, Dr. Frias was a member of the prison medical staff. Compl. ¶¶ 6–7. Mr. Jackson complained to her "on several occasions" during the summer of 2015, and she allegedly stated that "since he was going to return to federal custody shortly, then [he could] get his care from the Federal government." *Id.* ¶ 29.

Mr. Jackson has adequately pleaded personal involvement by Dr. Frias. His allegations, taken as true, push his case far beyond "a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights." *See Ozoroski v. Maue*, No. 08-CV-0082, 2009 WL 414272, at *10 (M.D. Pa. Feb. 18, 2009). Instead, Mr. Jackson's complaint "name[s] the individual[] responsible, the conduct, the time, and the place of the incident that deprived [him] of his civil rights." *See id.*

### CONCLUSION

For the foregoing reasons, Corizon and Almeda Frias's motion to dismiss is granted in part and denied in part. An appropriate order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE